

# NUMBER 13-22-00416-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

SALINAS CONSTRUCTION
TECHNOLOGIES, LTD. AND
SALINAS AND SONS, INC.,                                          Appellants,

v.

CITY OF CORPUS CHRISTI,                                          Appellee.

## ON APPEAL FROM THE 117TH DISTRICT COURT
## OF NUECES COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Justices Benavides, Tijerina, and Silva**
**Memorandum Opinion by Justice Tijerina**

Appellants Salinas Construction Technologies, Ltd. (SCT) and Salinas and Sons Inc. (S&S) (collectively Salinas) appeal from the trial court's judgment in favor of appellee the City of Corpus Christi. By four issues, which we reorganize, Salinas argues that: (1) there is legally insufficient evidence that he materially breached the contract; (2) there is

factually insufficient evidence to support the trial court's finding that the City did not breach the contract; (3) there is legally insufficient evidence to support damages; and (4) there is legally insufficient evidence to support the award of attorney's fees. We affirm.

## I. BACKGROUND

SCT is engaged in the business of constructing streets and underground utilities, and S&S is a general partner of SCT. In 2014, Salinas entered a contract with the City for the construction of street, drainage, and utility improvements on Horne Road (the project). The City retained Naismith Engineering, Inc. (NEI) to serve as its consulting engineering firm for the project. Wilfredo Rivera, P.E., served as Project Engineer and approved, signed, and sealed the plans for the project. The contract was originally valued at $1,884,600.57.

The contract duration was for 180 days, provided for a substantial completion date of April 20, 2015, and a final completion date of May 24, 2015. No time extensions would be allowed on the project. Salinas began performing on the contract on October 27, 2014. Salinas requested two change orders, which were implemented, thereby extending the contract duration to 284 days. During this time, the City asserts that Salinas failed to account for rain days, protect the job site from surface water, drain standing water, make progress, and abide by the contract terms. The City terminated the contract on June 9, 2015, after Salinas had used 225 of the allotted 285 days.

### A. The Lawsuits

On June 7, 2017, Salinas filed suit against the City asserting "a claim under 42 U.S.C. § 1983 for violation of [Salinas's] substantive and procedural due process rights

2

as protected by the Fourteenth Amendment of the United States Constitution." The City responded, and the case was removed to federal court. While the case was pending in federal court, the City filed a counterclaim in the trial court asserting breach of contract, damages, and attorney's fees. Following the federal court's granting of summary judgment in the City's favor, the federal court remanded the remaining state-law claims to state court. Salinas filed additional causes of action, including breach of contract, prompt payment, and quantum meruit against the City. The trial court held a nine-day bench trial on the parties' competing breach of contract claims.

## B.    Shoemaker's Testimony

Jerry Joseph Shoemaker, a civil engineer working in a construction management firm, assisted the City in assessing the development of the project. He testified that in February 2015, he became actively involved in this project due to "the lack of production" as "very little work . . . had been performed." Shoemaker inspected the project site almost daily and provided the City with inspection reports. According to Shoemaker, Salinas was somewhere between 11% to 20% complete in February when he "should have been much further along at that point in time." Shoemaker was also concerned with public safety issues. The "general housekeeping at the project site was in bad shape" and "created a public safety issue for the traveling folks." From November 2014 to February 2015, Salinas had completed about "$100,000 worth of work, plus [the] mobilization,[1]" but after that, Salinas "went the opposite direction" and was not "even hitting $20,000 in production

---

[1] "Mobilization is the cost to—for a contractor to set up, initiate their subcontracts, get their field trailer out, get the traffic devices and stuff that they need to execute the contract," explained Shoemaker.

3

per month." Shoemaker explained that, to stay on schedule, invoices needed to be hitting between $300,000 to $400,000 a month based on the $1.5 million still left on the contract. Instead, Shoemaker stated that the last three invoices submitted by Salinas fell substantially short: $6,452 in March, $13,358 in April, and $11,480 in May.

Shoemaker explained that several meetings occurred in March and April with Salinas and other City representatives. According to Shoemaker, he had multiple conversations with Salinas about increasing crew members so that they could start increasing productivity:

> [T]he primary topic was increasing the productivity and work force that they had on the site, providing better housekeeping, getting the traffic controls properly placed, and alleviating the flooding that was occurring on the sides of the street, which forced people into the center of the roadway, and doing better maintenance on the existing roadway so that cars weren't dodging potholes and becoming hazardous to the other vehicles coming in the opposite direction.

Specifically, Shoemaker instructed Salinas to increase production from $10,000 a month to $300,000—as is typical for all other City projects.

Shoemaker stated that when it rained, "Salinas would abandon the work site and just let it pond throughout the site, instead of trying to channel the water to some other storm water relief through a series of trenches or through the City's underground storm water system," which would "create huge problems for both their construction productivity and for the adjacent property owners." Further, Salinas "didn't have a regular superintendent that had been submitted by them and approved by the City. They had various players in there." Shoemaker stated that the City was "trying to encourage [Salinas] in every way [it] could to help get . . . a properly developed schedule [so] that

4

[Salinas] could execute and maintain through the project completion." But it never appeared to him "from the work in the field and the pay estimates that [Salinas was] adhering to a schedule that was consistent with the City's requirements."

**B.      Rivera's Testimony**

Rivera testified that prior to construction, Salinas requested that the intended location of a new water line be moved, and the City agreed to Salinas's requested change despite Rivera's opinion that no change was necessary. Salinas requested another change to the water line, and the City ultimately agreed to another change. Again, Rivera disagreed that this change was necessary. As a result of these changes, change order number one was implemented, and the contract was extended by sixty-one days.

Regarding change order number two, Rivera recommended that the City grant Salinas an extension of forty-three days to account for rain delays. Although the contract did not provide for rain delays, Rivera testified, "I was extra nice, I shouldn't have been as nice, but I did approve some of the higher numbers for rain days . . . [to] help [Salinas] along[;] we were hoping we [would] just get it moving along and we were going to approve this change order and keep going."

In April 2015, only 10% to 15% of the work on the entire project had taken place. Rivera added that Salinas did a "poor job" in maintaining stormwater drainage at the project site. Rivera was also concerned with Salinas's various safety violations. Rivera stated that Salinas was not showing up to the project on a regular basis, so Salinas was not "on site to maintain the traffic control plan." Rivera would find signs knocked down or blown over; the signs were not maintained to adequately channel traffic.

5

Rivera explained that Salinas's "pavement repair method . . . kept falling apart, so it led to potholes along the northern corridor everywhere." Rivera questioned Salinas's use of asbestos cement "because if the fibers become airborne, they can get in your lungs and they lead to some kind of . . . cancer." Rivera stated that he met with Salinas and said, "[P]lease do not cut that [asbestos] line," yet Salinas cut it anyway. Rivera further testified that Kaye & Sons, hired by Salinas as a subcontractor in November, completely stopped working on the project and abandoned the site by April 17, 2015.

On May 15, 2015, Rivera provided Salinas with written notice that there were still numerous concerns: Salinas's revised recovery schedule was not acceptable; on May 14, "minimal crew doing minimal work" were on site; the level of effort needed to be increased; and Salinas failed to provide an acceptable recovery schedule, along with several other deficiencies.

## C.    Edmond's Testimony

On May 1, 2015, Jeffrey Edmonds, the City's Director of Engineering, provided Salinas with notice that Salinas failed "to adequately prosecute the work and maintain the work site"; "[t]he current progress [wa]s unacceptable"; Salinas was "delaying completion of the [w]ork"; NEI identified and provided Salinas with notice "identifying numerous ongoing problems and issues with Salinas'[s] performance"; Salinas failed to adequately maintain the traffic controls and roadway maintenance, resulting in "potentially hazardous conditions to the traveling public"; "poor site maintenance . . . caused excessive ponding and poor conditions within the work site, further diminishing productivity"; and Salinas failed to adequately file verifications of existing utilities.

6

On May 16, 2015, Edmonds attended a meeting with Salinas, NEI, and City representatives. According to Edmonds, he "was hoping to leave that meeting with some kind of sense of confidence that [Salinas] would be able to complete this project in a reasonable amount of time," but Edmonds "left that meeting with less confidence than what [he] came in with." Edmonds thought that Salinas's representatives acted as if "they were entitled to ask for significant amounts of additional time on the contract."

On June 9, 2015, Edmonds notified Salinas that it was in default of the contract, including: "(1) a persistent failure to perform the [w]ork in accordance with the [c]ontract [d]ocuments, including failure to supply sufficient[ly] skilled workers or suitable materials or equipment; and (2) a persistent failure to adhere to the [p]rogress [s]chedule," which justified termination for cause. Edmonds formally terminated the contract on June 9, 2015, and on June 19, 2015, the City entered a new contract with Clark Pipeline Services (CPS) to complete the project.

## D.    Ruling

Following the bench trial, the trial court ruled in favor of the City on its breach of contract claim, awarded it $706,221.67 in actual damages, prejudgment interest, $419,420 in attorney's fees and conditional appellate fees, issued findings of fact and conclusions of law, and issued a take-nothing judgment on Salinas's breach of contract claim. This appeal followed.

## II.    LEGAL SUFFICIENCY

By its first issue, Salinas argues "[t]here is no evidence that [Salinas] breached the contract." Specifically, Salinas asserts that "[t]he evidence introduced at trial falls far short

of establishing any default by [Salinas] through defective work that had to be removed and replaced" by CPS. The City asserts there was legally sufficient evidence that Salinas breached the contract in at least four different ways: (1) failing to make satisfactory progress toward timely completion; (2) failing to adequately staff the project; (3) failing to devote sufficient resources to the job; and (4) persistently disregarding safety and instructions of the engineer. *See Acceptance Ins. Co. v. Lifecare Corp.*, 89 S.W.3d 773, 782 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.) (holding that a plaintiff alleging a breach of contract has the burden to prove (1) a valid contract existed; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff sustained damage as a result of the defendant's breach).

## A. Standard of Review

In a legal sufficiency assessment, we determine whether the evidence supporting the challenged findings rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Evidence is legally insufficient to support a disputed fact finding when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. We view the evidence in the light most favorable to the judgment and indulge every reasonable inference that would support it. *Id.* at 822. The factfinder is the sole judge of the weight and credibility of the evidence. *Id.* at 819. When the evidence is conflicting, we must presume that the factfinder resolved the

8

inconsistency in favor of the challenged finding if a reasonable person could do so. *Id.* at 821. We do not substitute our judgment for that of the factfinder if the evidence falls within this zone of reasonable disagreement. *Id.* at 822.

## B. Discussion

The contract expressly states that the following events constitute a default and justify termination for cause: (1) the "[c]ontractor's persistent failure to perform the Work in accordance with the Contract Documents, including failure to supply sufficient skilled workers or suitable materials or equipment;" (2) "[f]ailure to adhere to the Progress Schedule"; (3) the contractor's disregard of laws or regulations; and (4) the contractor's repeated disregard of the authority of the City's team.

As extended, substantial completion was required by August 6, 2015. Yet, the recovery schedule Salinas submitted to the City, did not contain a substantial completion date, but contained a final completion date of September 30, 2015. Thus, Salinas's own recovery schedule demonstrated he was unable to meet the contract's deadline.[2] Therefore, there was evidence of Salinas's failure to adhere to the progress schedule.

Furthermore, numerous notices to Salinas dated March 24, April 30, May 1, May 15, June 9, June 15, June 19, and were submitted into evidence providing that Salinas failed to comply with a litany of contract terms. For example, on March 24, 2015, NEI informed Salinas it had concerns regarding the lack of progress, its poor safety practices, and its failure to meet the terms of the contract. The notices included several examples

---

[2] The original contract was for a total of 180 days. Two change orders were granted for 104 days. Thus, the total time allowed on the contract was 284 days. As of June 9, 2015, Salinas had used 225 days, and there was evidence that only about 10% of the work on the contract had been completed.

of what NEI deemed were contract violations, including the absence of a qualified superintendent to oversee the project. NEI expressed that only thirty-four days remained to reach substantial completion, but only 11% of the construction work had been completed since Salinas began the project.

On April 30, 2015, NEI informed Salinas that the City was "gravely concerned about the progress of construction," Salinas "has abandoned work on the project," and the "failure to adequately maintain the project site have become a public affairs nightmare for" the City. The notice further detailed several other violations.[3] On May 15, 2015, NEI reiterated that the effort being put forth by Salinas "is **NOT** considered adequate to 'Recover' the project schedule," and that it was "imperative that [Salinas] immediately marshal its resources and proceed to meet the accelerated schedule as soon as possible."

Several NEI construction site inspection reports were admitted into evidence. Most of the notices began with "no progress of work for today" while several other reports noted "no workers on site." Furthermore, all inspection reports scrutinized various discrepancies, issues, and contract violations, along with several pictures of the complained-of issues. Almost every daily inspection report dated between March 4, 2015,

---

[3] Some of these violations were that loose gravel existed on the public travel lanes; there was debris in the driveways to multiple businesses; silt accumulated in several locations; surplus construction material from completed work existed including the asbestos-cement pipe; excess excavated material obstructed pedestrian access and covered existing access; and several conflictions with stormwater requirements, among others.

through May 29, 2015, included an array of photos of alleged contract violations. Shoemaker, Edmonds, Rivera, all corroborated the substance of the notices.[4]

Daniel Salinas, a Salinas representative, conceded that the contract specifically prohibited cutting the asbestos cement pipe; however, Daniel claimed Salinas was unaware its employee had cut the pipe. According to Daniel, the contract required the contractor to dispose of the asbestos pipe in accordance with all applicable regulations, but Daniel stated Salinas was not able to comply "before [the] contract was terminated" because he claimed the City needed to pay for those fees. However, Daniel acknowledged that he "had from March [until] June" to comply with the applicable regulations. Thus, based on the foregoing, we conclude there was legally sufficient evidence that Salinas breached the contract, and we overrule its first issue. *See City of Keller*, 168 S.W.3d at 822.

## III. FACTUAL SUFFICIENCY

By its second issue, Salinas argues the evidence was factually insufficient to show that the City did not breach the contract. Salinas argues the "record is replete with evidence establishing that the City breached the contract and should be held liable for damages." According to Salinas, the City breached the contract by: (1) prohibiting Salinas from working while the first change order was being processed; (2) failing to provide timely responses to RFIs submitted by Salinas; (3) not offering equitable adjustments in contract time; and (4) not paying for work that had been completed.

---

[4] On cross-examination, when Daniel Salinas, a Salinas representative, was questioned regarding the matter in the notices, he often replied: "That's what it says."

11

## A. Standard of Review

"When reviewing the factual sufficiency of the evidence, we examine the entire record, considering all the evidence both in favor of and contrary to the challenged finding." *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.). When a party attacks the factual sufficiency of the evidence pertaining to a finding on which the party did not have the burden of proof, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Bennett v. Comm'n for Law. Discipline*, 489 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also Torres v. Cameron County*, No. 13-20-00568-CV, 2022 WL 17844210, at *5 (Tex. App.—Corpus Christi–Edinburg Dec. 22, 2022, no pet.) (mem. op.). "We consider all the evidence, but we will not reverse the judgment unless the evidence which supports the finding is so weak as to [make the finding] clearly wrong and manifestly unjust." *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 324 (Tex. App.—Houston [14th Dist.] 2021, pet. denied) (cleaned up). "The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment." *Id.* "The trier of fact is the sole judge of witnesses' credibility and the weight afforded their testimony," and "we may not pass upon the witnesses' credibility or substitute our judgment for that of the fact[ ]finder, even if the evidence would also support a different result." *Id.* at 825; *see City of Keller*, 168 S.W.3d at 819–20.

## B. Discussion

Salinas asserts that the record shows the City took three months to process the

12

first change order while also insisting that no work be performed on tasks identified in the change order until the change order was approved by the City. However, the evidence provided that the express terms of the contract provided that "[a]cceptance of a Change Order by [Salinas] constitutes full accord and satisfaction for any and all claims and costs of any kind . . . including but not limited to impact [and] delay . . . arising from the subject matter of the Change Order." Thus, Salinas agreed that its acceptance of a change order would result in forfeiting a complaint regarding delays. Moreover, the contract provided that all change orders required approval by the City Council, and the "approval process requires a minimum of 45 days after submission." The evidence at trial established that Salinas signed the change order on April 27, 2015, and the City obtained all required signatures by May 21, 2015—well within the 45 days required by the contract. Thus, the trial court did not err when it found that the City did not breach the contract by allegedly delaying Salinas's performance on the contract via change order approvals.

Next, in a single sentence, Salinas asserts the City breached the contract by "routinely fail[ing] to provide timely responses to RFIs submitted by [Salinas]."[5] However, the contract did not impose any deadlines regarding RFIs. The City provided evidence of a "Request for Information Analysis" detailing the RFI number, issue description, bates number, Salinas's request date, and the City's actual response date. Based on the twenty-three RFIs Salinas submitted, the City's average response time was 4.9 days. Salinas does not indicate which provision of the contract the City allegedly violated. *See* TEX. R. APP. P. 38.1(i). Therefore, we cannot conclude that the City breached the contract

---

[5] An RFI is a "Request for Information."

13

in this regard.

Next, Salinas asserts that the City breached the contract because the "City failed to advise any of the bidding contractors that the sanitary sewer line B already had breaks in it as evidenced by a prior video" because the "video made it clear that the repair specifications in the initial plan were not feasible." However, Salinas does not direct us to any portion of the contract the City violated, and we are unable to determine which part of the contract the City may have violated. *See id.* In other words, Salinas does not direct us to any provision of the contract requiring this disclosure. *See id.*

Rivera testified that the City conducted "preliminary engineering" to assess all existing utilities and obtained a video of the existing sewer line around 2012 showing some breaks in the pipeline. According to Rivera, the project "called for rebuilding" the new line, and the City "had made the decision to either rehab, repair, or do something [else] to both sewer lines." As a result, "the contractors all knew what they bid on" because "it was part of the project the whole time." Furthermore, Rivera testified that the contractors "were supposed to do an additional investigation as part of their contract and provide that information to [the City]" because things might have changed; for instance, the pipe might have "collapsed a little more or shifted some more" by the time the contractors would begin work at the end of 2014. Rivera specified that "before a decision to rehabilitate" a pipeline occurs, contractors "should know that an investigation was done of some sort and whether there was video or another type of investigation, visual or some sort . . . done previously by the City's own staff." Thus, we are unable to determine that the trial court's finding that the City did not breach the contract was clearly wrong or unjust.

14

*See Bennett*, 489 S.W.3d at 66.

Lastly, Salinas argues the City "breached the contract by not paying for work that had actually been completed." According to Salinas, the City failed to pay for estimates seven and eight. Estimate seven is dated May 30, 2015, and estimate eight is dated June 30, 2015. Salinas conceded that a provision in the contract authorized the City to withhold payment on an estimate if there were grounds for terminating the contract. Here, grounds to terminate the contract surfaced prior to May 30, 2015.[6] Therefore, we cannot conclude that the City breached the contract by failing to pay "for work that had actually been completed." When viewed in a neutral light, the trial court's finding that the City did not breach the contract is not "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *4922 Holdings*, 625 S.W.3d at 324. We overrule Salinas's second issue.

## IV. DAMAGES

By its third issue, Salinas argues there was legally insufficient evidence of damages. Specifically, Salinas argues there was no evidence that it was necessary for the City to repair or replace Salinas's work because the work he performed was defective. Salinas further argues there was no evidence that the cost of the replacement work was reasonable.

### A. Applicable Law

---

[6] Some of these grounds included persistently failing to perform work in accordance with the contract, failing to supply sufficient skilled workers or suitable materials or equipment, failing to adhere to the progress schedule, disregarding laws or regulations regarding safety, and a repeated disregard of the authority of the City's team.

The measures of damages for the breach of a construction contract include remedial damages and difference-in-value damages. *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012) (per curiam). Remedial damages, which are applicable here, include the cost to complete or repair less the unpaid balance on the contract price. *Id.* A party seeking to recover remedial damages must prove that the damages sought are reasonable and necessary. *See id.*; *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200 (Tex. 2004) (per curiam). "[T]he plaintiff must show more than simply 'the nature of the injuries, the character of and need for the services rendered, and the amounts charged therefor.'" *McGinty*, 372 S.W.3d at 627 (quoting *Dall. Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 383 (Tex. 1956)). "Instead, some other 'evidence showing that the charges are reasonable' is required." *Id.*

## B.    The Evidence

Shoemaker testified that CPS finished the project in 135 days. Shoemaker stated that "as a result of Salinas's quality control problems[,] . . . [the City] had to rework some of the water lines that Salinas installed." Some water lines "had to be removed and replaced by [CPS] because those lines had been spliced without the City's knowledge, and it's improper to splice that service line," Shoemaker stated. He also clarified that there were some problems with curb inlets, and CPS "replace[d] those with a cast in place, as [was] required in the specifications." CPS also had to rework "storm water laterals"; CPS "had to go in and replace it." In particular, CPS had to "open up, excavate some areas" because "Salinas improperly cut the length of the storm water rigid concrete pipe."

16

According to Shoemaker, Salinas had placed some "base material [that] had to be removed. It had failures, it has spot failures throughout it . . . so we had to pull out the entire base, rework it." Shoemaker added that the base material was tested by Rock Engineering, "and those tests results indicated it had to [be removed] and disposed of." Specifically, Rock Engineering performed six tests for geo-technical reports, but for three of those, Rock Engineering was "unable to even pull the material to conduct the test because the compaction was not there[;] it was too unstable even to get a core sample." CPS additionally "had to haul off some[]asbestos pipe that was left[]- exposed."

The City paid CPS $2,078,191.69 for its services, and CPS's invoice was admitted into evidence. Shoemaker clarified that CPS's invoice went through the City's engineering department for approval. Shoemaker explained that the amount charged by CPS was in accordance with the standard of costs and expenses on similar projects in the industry. Specifically, in this case, CPS was the third lowest bidder. Although CPS's "bid was a little bit in excess of the actual payment that was paid to them at the end," the City and CPS "negotiated out" and "reduce[d it] to a reasonable rate." Thus, "that cost was based on competitive bids and then further negotiated down, for the City's benefit." Additionally, Rivera testified that the amount the City paid CPS to finish the project was reasonable "given the state of the project as it existed after Salinas." Specifically, Rivera opined:

> [H]aving to rework the existing site and having to kind of negotiate, using the unit rates that were established from the Salinas contract and then also from the [CPS] unit rates that were established on the bidding of the same project, I think ultimately that was a fair price that they—they were paid for that work.

17

Shoemaker believed that it was also necessary to seek additional engineering services from NEI to oversee CPS's project, which cost $136,000. Shoemaker stated that the charges by NEI were reasonable and proper in accordance with local prices. Rivera explained that NEI's requested amount was negotiated each time: "[A]ny time I request an amendment to a contract I have to provide or discuss the scope of work with the City's project manager . . . and it goes back and forth [because] we don't bill like contractors do, on a unit rate basis, it's pretty much a lump sum."

Shoemaker further stated that it was necessary to enter an additional contract with the barricade contractor for the additional time and work, which totaled $2,000. Shoemaker believed $2,000 was reasonable because "[t]he City assumed that contract direct[ly]; instead of passing it through a general contractor, [the City] did a direct cost." This was "more cost effective," according to Shoemaker.

Christopher Clark, a CPS representative, testified that the City presented him with Salinas's numbers and asked if it would agree to complete the project. Clark stated that CPS completed "a six-month project in three months." He added that the street was torn; the "elevation was wrong on the inlets"; "one of the sidewalks was wrong, it wasn't ADA compliant"; and "the bells[7] were cut off at the middle of the road." According to Clark, the inlets were at the wrong elevations, and "they're expensive to pull out because they're big." Clark explained that CPS had to pull them up and "dowel everything [into the] concrete," which is "very time-consuming." Clark informed the trial court that CPS also had to perform repairs on the underground utilities by pulling the existing line that was

---

[7] Clark explained a bell "is where the new pipe goes into the other one."

18

laid. Clark stated that CPS disposed of asbestos pipe that was "sitting on the side of the road . . . by Stripes," which "was shocking" to him.

According to Clark, NEI assessed and surveyed Salinas's work to determine whether it needed to be corrected; Clark had no authority to make those determinations—it only followed directives. Out of the 10% of the project Salinas had completed, Clark estimated the about 8–9% "was bad." Clark opined that he believed the amount of work CPS completed and the amount the City paid CPS for the project were reasonable; he further added that he worked several nights and weekends to complete the project.

## C.    Discussion

The trial court awarded the City $706,221.67 in damages, including: (1) $575,834.67 for additional construction costs,[8] (2) $136,383 for additional engineering costs, and (3) $2,001 for safety barricading costs. The trial court found that Rivera's thirty-year experience as an engineer and his overseeing of this project at the preliminary stage, the design stage, and the bidding stage as submitted to the City for approval, gave him sufficient background and expertise to opine on whether the City's payment to CPS was reasonable. Shoemaker and Clark testified that it was necessary for Clark to perform additional work on the project because CPS needed to rework some of Salinas's construction. For example, Shoemaker stated that the City had to pay CPS for bringing in "virgin limestone" while Salinas's contract required Salinas to rework an existing base. Thus, CPS's and Salinas's contracts differed in terms because according to Shoemaker,

---

[8] The City paid CPS $2,078.191.69, minus the unpaid balance on Salinas's contract $1,510,357.02, which equaled a net result of $567,834.67.

19

"the existing material was ruined by the actions that Salinas took," so the City "had to completely remove it, it could not be reused or salvaged and so therefore, virgin material was brought in. Once you mix it with cement, you can't reuse it."

Rock Engineering's testing results were also admitted into evidence, demonstrating that material Salinas used had failed testing. Therefore, a reasonable factfinder could conclude that Salinas's work was deficient at the time of termination. *See McGinty*, 372 S.W.3d at 627. Because there was some evidence that Clark's contract required him to remediate Salinas's efforts, we reject Salinas's argument that the City failed to produce evidence that it was necessary for Clark to repair Salinas's work. *See id.*

Regarding additional safety services, Rivera stated that he had to investigate existing conditions, and survey sections to verify if they complied with safety requirements. Shoemaker testified that NEI was providing the city with the day-to-day activities of CPS's project, monitoring Clark's work progress, reviewing Clark's RFIs, and reviewing CPS's pay estimates. Shoemaker stated that any completion contract would have required these services whether the project was to be completed by Salinas, Clark, or another third party. The trial court further found that Shoemaker's testimony regarding the reasonableness of the charges was sufficient based on Shoemaker's experience and qualifications. Shoemaker clarified that each NEI amendment was "specifically negotiated out for the amount of hours and time that [the City] wanted [NEI] on site for the project and the requirements." Thus, "each and every one of [those amendments] are accurate and reasonable, based on the fee and the costs proposals that [NEI] provided to [the City]

20

and the scope of work" they were asked to do. Accordingly, there was evidence that additional engineering services were required and necessary to complete the project. *See id.*

Regarding the safety barricades, Shoemaker testified that they were necessary to ensure the safety of the public. The City also provided evidence that keeping that contracting in-house was cheaper, and thus, the trial court could have determined this amount was reasonable and necessary. Based on the evidence produce at trial, we conclude that there was evidence that the additional construction costs, additional engineering services, and safety barricades were reasonable and necessary. *See id.* We overrule Salinas's third issue.

## V. ATTORNEY'S FEES

From S&S, the trial court awarded the City attorney's fees pursuant to § 38.001 of the Texas Civil Practice & Remedies Code[9], § 16.02(f) of the contract, and § 2251.043 of the Texas Government Code. From SCT, the trial court awarded the City attorney's fees under § 16.02(f) of the general conditions of the contract and under § 2251.03 of the Texas Government Code.

By its last issue, which includes several sub-issues, Salinas argues that the City is not entitled to recover attorney's fees: (1) because S&S was not a party to the contract under § 38.001; (2)–(3) because the City failed to prove and segregate attorney's fees under § 16.02(f) of the contract; (4) because the award is excessive and unreasonable;

---

[9] Because the award of attorney's fees under this section is dispositive, we need not address whether attorney's fees are recoverable under § 16.02(f) of the contract and § 2251.043 of the Texas Government Code.

21

(5)–(6) because the Prompt Payment Act is not a basis for recovery, and the "trial court had no legal basis to award appellate attorney's fees"; and (7) because there is insufficient evidence to support the award of appellate attorney's fees.[10]

## A.    The Hearing

Attorney Ken Fields testified that he has been practicing law for over forty years, and charges $225 an hour for legal services, which he stated was reasonable and customarily charged in the locality for similar services.[11] Fields discussed the board certifications of the lawyers in his practice and their experience (ranging in the decades) regarding construction disputes. According to Fields, "construction cases are very fact-intensive and technical" as they involve "a large number of documents" and "number of legal questions that arose from the interpretation of the parties' . . . long, voluminous construction contract."[12] He further briefed in detail issues between governmental immunity and Salinas's claims and remarked that "both parties did a great deal of the briefing in the case." According to Fields, this type of case required a greater-than-average amount of skill on the lawyers' part. Fields added that he charged a fixed fee.

---

[10] Salinas also argues that the City is not entitled to recover attorney's fees from SCT pursuant to § 38.001 because SCT is a limited partnership, and at the time suit was filed, the statute limited recovery of attorney's fees to "an individual or corporation." However, the trial court did not find that SCT was responsible for attorney's fees pursuant to § 38.001; therefore, we need not address this argument. Instead, the trial court found that the SCT was liable for attorney's fees under § 16.02(f) of the contract and § 2251.043 of the government code.

[11] Fields added that these rates "may be on the low side, if anything."

[12] The trial court stated that the record in this case "occupied eight shelves in [its] chambers," and that "this is not your usual case . . . . [T]his is volumes, boxes that were presented to the Court. And I can't image what you-all had in your files, because obviously not everything you had in your files was admitted and presented to the Court."

Fields explained that Salinas was suing the City for over $1,000,000 while the City was attempting to recover over $700,000 in compensatory damages. The City tried to settle this case numerous times, and the case unsuccessfully went to mediation twice. He added that each settlement the City offered "was more favorable than the results" the City obtained in this case. Because of the unsuccessful settlement efforts, the City had no "choice but to prepare the case for trial and try it and that gets expensive in this kind of case." Fields explained the City spent four to five months for trial; the trial here lasted nine days. According to Fields, he disclosed to Salinas that the City was requesting $157,919 in fees "only for the Horne Road dispute . . . and [he] explicitly stated that those were only the fees incurred through June of 2019 . . . [a]nd [he] also explicitly stated that additional fees would continue to be incurred as the case progressed."

Regarding the paralegal fees, Fields stated that his paralegal, who he described as "excellent," had over twenty years of experience, and charged $85 an hour. The work she performed was done under the attorneys' supervision, and the nature of the work she performed was reflected in the fee statements.

Additionally, Fields opined that a reasonable fee to represent the City in the event of an appeal would cost at least $35,000, and if review was sought in the supreme court an additional $20,000 would be reasonable. "[T]hose amounts are quite a bit lower than I would normally estimate, but I am hoping that the work that has already been done during the posttrial briefing period will shorten the appellate process some," he clarified.

The trial court admitted the firm's periodic fee statements into evidence. Fields testified that those fee statements accurately reflected the work that was done on this

23

case. It contained a description of the services performed, identified who performed them, when they were performed, the amount of time spent on those services, and the dollar amount billed to the City. Fields explained that these statements "were compiled from entries made at or near the time the work was done, by or from information transmitted by someone with knowledge of the facts stated in the fee statements." Fields further created a tabular summary of attorney's fees, which compiled all invoices and the gross amount billed.

The trial court found that the City was entitled to recover from Salinas $419,420 as reasonable and necessary attorney's fees, $35,000 in the event Salinas pursued an appeal in the court of appeals, and $20,000 in the event Salinas sought review in the Texas Supreme Court.

## B.    S&S & § 38.001 of the Texas Civil Practice & Remedies Code

First, Salinas argues that the City cannot recover attorney's fees from S&S because "there was no contract between the City and S&S" and the "only contract at issue in this appeal is the contract between SCT and the City."[13]

Section 38.001(8) allows a prevailing party to recover its "reasonable attorney's fees . . . in addition to the amount of a valid claim and costs," pursuant to a written contract. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(b)(8). To recovery attorney's fees under this section, "the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party." *Richard Gill Co. v. Jackson's Landing Owners'*

---

[13] We note that although S&S and SCT filed claims against the City in the trial court for breach of contract, Salinas now claims the City may not recover against S&S.

24

*Ass'n*, 758 S.W.2d 921, 927 (Tex. App.—Corpus Christi–Edinburg 1988, writ denied). "The purpose of presentment is to make the opposing party aware that a claim is asserted against him, and to allow him an opportunity to pay the claim or to perform as required and to thereby avoid incurring an obligation for attorney's fees." *Id.* at 927. General partners are jointly and severally liable with each other and with the limited partnership for the partnership's obligations. *See* TEX. BUS. ORGS. CODE ANN. § 153.152(b); *Forney 921 Lot Dev. Partners I, L.P. v. Paul Taylor Homes, Ltd.*, 349 S.W.3d 258, 273 (Tex. App.—Dallas 2011, pet. denied); *Shaw v. Kennedy, Ltd.*, 879 S.W.2d 240, 247 (Tex. App.—Amarillo 1994).

It is undisputed that S&S is a general partner of SCT, and "a general partner of a limited partnership is liable for the debts of that limited partnership." *Forney 921 Lot Dev. Partners I, L.P.*, 349 S.W.3d at 272. Therefore, S&S is liable for the debts of SCT. *See id.* S&S further "challenges [the City's] claim for attorney's fees against it because the City did not timely present any attorney fee claim to it," and as a matter of law, the City failed to provide notice of the claim. However, there was evidence that on November 28, 2016, Edmonds sent SCT a letter demanding payment of $716,148 for reasonable and necessary costs to complete the project pursuant to the contract. Additionally, on August 6, 2019, the City again demanded payment from S&S's counsel for damages in the amount of $706,221. "No particular form or manner of presentment is required." *Richard Gill*, 758 S.W.2d at 927. This is sufficient evidence that demand was made against Salinas for the amounts claimed in the present suit. *See id.* Therefore, we reject Salinas's argument that the City may not recover attorney's fees from S&S.

25

**C. Section 16.02(f) of the Contract**

Next, Salinas argues that the fees "that were awarded in the judgment reflect fees that could not have been authorized by [§] 16.02(f)."

"Parties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38's." *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). When parties include either standard of provision in a contract, the language of the contract controls, rather than the language of the statute. *Id.* at 654–56. Here, the parties did not contract for a recovery of attorney's fees, and the parties do not refer us to any provision in the contract relating to the recovery of attorney's fees. Salinas acknowledges that the contract is "silent as to any attorney fee shifting for litigation or arbitration," yet he argues that § 16.02(f) of the contract "limits an award of attorney's fees to completion costs."

Section 16.02(f) provides that if the City terminates the contract due to the contractor's default, the contractor is responsible for the amount left on the contract "if the unpaid balance exceeds the cost to complete the [w]ork. This cost to complete the [w]ork may include related claims, costs, losses, damages and the fees and charges of engineers . . . attorneys, and other professionals retained by the [City.]." Rather than address the recovery of attorney's fees in a litigation proceeding, this general provision of § 16.02(f) relates to costs to the complete the project and the recovery of fees from different professionals, including attorneys. To the extent that the City incurred fees by a professional, the City would be able to recover that fee as a completion cost. In this regard, Fields testified that the City incurred prelitigation attorney's fees for the completion

26

of Horne Road. As of June 2019, Fields explained that prelitigation attorney's fees were in the amount of $157,919—this was the cost to complete the work. Because § 16.04(f) the contract authorizes professional fees, including attorneys, and the City incurred prelitigation fees in the amount of $157,919, the trial court did not err in awarding the City attorney's fees on this basis. *See Intercontinental Grp. P'ship*, 295 S.W.3d at 653.

Salinas further argues that the City failed to comply with a condition precedent. According to Salinas, the City was required to submit its attorney's fees via change order, and because the City failed to submit its attorney's fees via change order, the trial court erred in awarding attorney's fees under § 16.02(f). Salinas relies on the following: "Claims, costs, losses, and damages incurred by [the City] are to be reviewed as to their reasonableness and incorporated in a Change Order by OAR. [The City] is not required to obtain the lowest price for the Work performed when exercising its right or remedies under this paragraph." The foregoing clause requiring damages to be submitted via change order relates to the work performed and submitting the work performed via change order. It does not address the recovery of attorney's fees. Therefore, we conclude that the City did not fail to comply with a condition precedent. *See id.*

## D. Reasonableness & Sufficiency

By its next sub-issues, Salinas argues the City failed to prove its attorney's fees claim, failed to segregate attorney's fees, and the attorney's fees were excessive and unreasonable.

### 1. Applicable Law & Standard of Review

Generally, the award of attorney's fees rests in the sound discretion of the trial court. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761 (Tex. 2012). The prevailing party has the burden to prove its fees are both reasonable and necessary. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 487 (Tex. 2019). Some factors guiding the factfinder in determining reasonableness and necessity include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Id.* at 494. Without evidence of these factors, "the fact[ ]finder has no meaningful way to determine if the fees sought are in fact reasonable and necessary." *Id.*

Whether an award of attorney's fees is reasonable is a question of fact; we review the reasonableness of the amount of the attorney's fees awarded for sufficiency of the evidence. *Sundance Mins., L.P. v. Moore*, 354 S.W.3d 507, 513 (Tex. App.—Fort Worth 2011, pet. denied). "Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the

28

services, and (5) the reasonable hourly rate for each person performing such services." *Rohrmoos*, 578 S.W.3d at 498. "This base lodestar figure should approximate the reasonable value of legal services provided in prosecuting or defending the prevailing party's claim through the litigation process," and "is the standard for calculating the reasonableness and necessity of attorney's fees in" this situation. *Id.* To support the requested amount of attorney's fees, parties frequently rely on the testimony or affidavit of the attorney of record. *See id.* at 476; *El Apple*, 370 S.W.3d at 759. The trial court found that the City was entitled to recover from Salinas $419,420 as reasonable and necessary attorney's fees, so we look for evidence at trial supporting this amount.

### 2. Discussion

In accordance with the factors in *Rohrmoos*, Fields provided over one hundred pages of statements detailing the work that was done, the date the work was completed, a description of the work completed, the identification of the person that performed the work, the time spent on each item, and the dollar amount that was billed. *See* 578 S.W.3d at 502 ("[B]illing records are *strongly* encouraged to prove the reasonableness and necessity of requested fees when those elements are contested."). Thus, there were contemporaneous records including the time spent on specific tasks. *Cf. Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014) (per curiam) (holding that an attorney's affidavit offering only generalities that he spent 300 hours on a case, another expended 344.50 hours, and the attorneys' respective hourly rates was insufficient where there was no evidence to inform the trial court the time spent on specific tasks other than "the case involved extensive discovery, several pretrial hearings, multiple summary judgment motions, and

29

a four and one-half day trial"). Fields further provided the trial court with a billing summary and explained how the summary worked: it reflected amounts for which the attorneys were not seeking compensation based on the federal court claims versus the amounts attributed to the work performed; it reflected the total hours for each person and the dollar amount, based on their hourly rate; it subtracted total deductions; and it reflected the amount awarded by the trial court in this suit. *Cf. Rohrmoos*, 578 S.W.3d at 503 (holding that the attorney's testimony that he searched through "millions" of emails and reviewed "hundreds of thousands" of papers in discovery, took more than forty depositions, and drafted a forty-page motion for summary judgment was too general to establish reasonableness and necessity of his request for $800,000 in attorney's fees because it lacked sufficient detail about the work done and how much time was spent on the tasks).

Fields testified regarding the time and labor involved, novelty and difficultly of the issues in the case, the skill required to perform the services, the fee customarily charged, the amount in controversy, the results obtained, the nature and length of his professional relationship with the City, the experience and reputation of his firm, and the fixed statute of the fees. *See id.* at 491. Fields acknowledged that he was not precluded from taking on other work and he did not need to act in an emergency basis. We conclude that the record contains sufficient evidence of the *Rohrmoos* factors.

Salinas further argues that the City failed to segregate its attorney's fees. "[A] claimant must segregate legal fees accrued for those claims for which attorney[']s fees are recoverable from those that are not." *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017). Here, the City was entitled to professional fees as costs to complete to project

30

pursuant to § 16.02(f) of the contract, and it was entitled to attorneys' fees as a prevailing party pursuant to § 38.001 of the civil practice and remedies code. Thus, the City was not required to segregate its attorney's fees because it was entitled to the recovery of professional fees as costs to complete the work *and* attorney's fees to prosecute and defend breach of contract claims thereafter. Thus, the City was not required to segregate legal fees accrued for those claims for which attorney's fees were not recoverable. *See id.* Fields stated that on July 26, 2019, the City was requesting attorney's fees in the amount of $157,919 for the dispute regarding the completion of Horne Road only. Fields informed Salinas that additional fees would continue to incur. Here, Fields testified that those additional fees amounted to $416,728. Fields testified that he redacted attorney's fees as they related to Salinas's constitutional federal claims, and the time spent on those matters were deducted from the total amount of time spent on this claim. This is reflected on the invoices and billing summary submitted into evidence. Therefore, we reject Salinas's segregation argument. Based on the foregoing testimony and evidence, we conclude there was sufficient evidence to support the attorney's fees award. *See Rohrmoos*, 578 S.W.3d at 494.

## E.    Prompt Payment Act

Salinas argues that § 2251.043 does not authorize an owner who successfully defends a payment claim by a contractor to recover attorney's fees. The statute recites: "In a formal administrative or judicial action to collect an invoice payment or interest due under this chapter, the opposing party, which may be the governmental entity or the vendor, shall pay the reasonable attorney fees of the prevailing party." TEX. GOV'T CODE

ANN. § 2251.043. The express language in the statute provides for an award of attorney's fees to the prevailing party. Here, the trial court found that the City prevailed on Salinas's chapter 2251 claim, and we agree. *See Mag Instrument, Inc. v. G.T. Sales Inc.*, 294 S.W.3d 800, 808 (Tex. App.—Dallas 2009, pet. denied) ("[T]he prevailing party is typically the party who either successfully prosecutes the action or successfully defends against it, prevailing on the main issue."). Therefore, the City, as the prevailing party, is entitled to recover attorney's fees under that statute. And, SCT, as the opposing party, was required to pay the City's attorney's fees. Accordingly, we find that § 2251.043 also authorized the City to collect attorney's fees as a prevailing party. *See* TEX. GOV'T CODE ANN. § 2251.043.

F. **Appellate Attorney's Fees**

Salinas argues that because the City was not entitled to recover attorney's fees under § 38.001, it cannot recover appellate fees. However, we have already determined that the City was entitled to attorney's fees pursuant to § 38.001 and § 2251.043. "If trial attorney's fees are mandatory under [§] 38.001, then appellate attorney's fees are also mandatory when proof of reasonable fees is presented." *Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015). Thus, if attorney's fees are mandatory under a statute, then appellate attorney's fees are also mandatory. *See id.*; *Iola Barker v. Hurst*, 632 S.W.3d 175, 195 (Tex. App.—Houston [1st Dist.] 2021, no pet.) ("When, as here, trial attorney's fees are mandatory under statute, then appellate attorney's fees are also mandatory when proof of reasonable fees is presented."). Applying the rule of the supreme court, we hold that § 2251.043's use of the phrase "shall pay the reasonable attorney fees of the

32

prevailing party" makes an award of attorney's fees mandatory upon demand and proof thereof and therefore requires an award of appellate fees upon proof thereof. *See Ventling*, 466 S.W.3d at 154; *Brent v. Field*, 275 S.W.3d 611, 622 (Tex. App.—Amarillo 2008, no pet.) ("A court possesses discretion to determine the amount of attorney's fees, but it lacks discretion to deny attorney's fees if they are proper under [§] 38.001."). Because attorney's fees were mandatory under § 38.001 and § 2251.043, the City was entitled to recover appellate attorney's fees pursuant to the same*.*

Salinas further argues that there was insufficient evidence to support the award of appellate attorney's fees. A "party seeking to recover contingent appellate fees from the need to provide opinion testimony about the services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020). In this case, having already testified as to his familiarity with the reasonable charges for attorney's fees in the locality and to his own hourly rate, Fields testified as to his opinion of what reasonable fees would be for the services "in the event there is an appeal" to this Court and the supreme court. He further explained, "[T]hose amounts are quite a bit lower than I would normally estimate, but I am hoping that the work that has already been done during the posttrial briefing period will shorten the appellate process some." His testimony was uncontroverted. The evidence was thus legally sufficient to support the award of appellate attorney's fees. *See State & Cty. Mut. Fire Ins. Co. v. Walker*, 228 S.W.3d 404, 408–10 (Tex. App.—Fort Worth 2007, no pet.) (holding there was sufficient evidence to support the award of appellate attorney's fees when the attorney testified, without contradiction

from opposing counsel, what he believed "a reasonable attorney's fee would be for the services that would 'necessarily need to be rendered' in the event of an appeal"). Having rejected all of Salinas's sub-issues, we overrule its last issue.

## VI. CONCLUSION

We affirm the judgment of the trial court.

JAIME TIJERINA
Justice

Delivered and filed on the
25th day of April, 2024.